UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHARLES D. WELKER, JR., <br><br> Plaintiff, <br><br> v. <br><br> ANDREW M. SAUL, <br><br> Defendant. | CIVIL ACTION NO. 3:19-CV-01919 <br><br> (MEHALCHICK, M.J.) |

**MEMORANDUM**

Plaintiff Charles D. Welker, Jr. brings this action under section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), for judicial review of the final decision of the Commissioner of Social Security (the "Commissioner") denying his application for disability insurance benefits under Title II of the Social Security Act. (Doc. 1). This matter has been referred to the undersigned United States Magistrate Judge on consent of the parties, pursuant to the provisions of 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (Doc. 9; Doc. 11). For the reasons set forth below, the Court directs that the Commissioner's decision be **AFFIRMED**.

I. **BACKGROUND AND PROCEDURAL HISTORY**

In February 2016, Welker protectively filed an application for Title II disability insurance benefits, claiming disability beginning October 30, 2014, due to bipolar disorder, attention deficit hyperactivity disorder (ADHD), and anxiety disorder. (Doc. 8-6, at 6). The Social Security Administration initially denied the application on May 25, 2016, prompting Welker's request for a hearing, which Administrative Law Judge (ALJ) Donald M. Graffius held on August 28, 2018. (Doc. 8-2, at 35). In a written decision dated September 24, 2018,

the ALJ determined that Welker is not disabled and therefore not entitled to benefits under Title II. (Doc. 8-2, at 16). The Appeals Council denied Welker's request for review. (Doc. 8-2, at 2).

On November 6, 2019, Welker filed the instant action. (Doc. 1). The Commissioner responded on January 15, 2020, providing the requisite transcripts from Welker's disability proceedings. (Doc. 7) (Doc. 8). The parties then filed their respective briefs (Doc. 13; Doc. 16; Doc. 17), with Welker alleging three bases for reversal or remand. (Doc. 13, at 9).

**II.   STANDARDS OF REVIEW**

To receive benefits under Title II of the Social Security Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1509. To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1505(a).[1] Additionally, to be eligible to receive Title II benefits, a claimant must be insured for disability insurance benefits. 42 U.S.C. § 423(a)(1)(a); 20 C.F.R. § 404.131.

   A.   ADMINISTRATIVE REVIEW

In evaluating whether a claimant is disabled, the "Social Security Administration,

---

[1] A "physical or mental impairment" is defined as an impairment resulting from "anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

working through ALJs, decides whether a claimant is disabled by following a now familiar five-step analysis." *Hess v. Comm'r Soc. Sec.*, 931 F.3d 198, 200–01 (3d Cir. 2019). The "burden of proof is on the claimant at all steps except step five, where the burden is on the Commissioner of Social Security." *Hess*, 931 F.3d at 201; *see* 20 C.F.R. § 404.1512(a)(1). Thus, if the claimant establishes an inability to do past relevant work at step four, the burden shifts to the Commissioner at step five to show that jobs exist in significant numbers in the national economy that the claimant could perform consistent with his or her residual functional capacity, age, education, and past work experience. 20 C.F.R. § 404.1512(a)(1).

    B.    JUDICIAL REVIEW

The Court's review of a determination denying an application for Title II benefits is limited "to considering whether the factual findings are supported by substantial evidence." *Katz v. Comm'r Soc. Sec.*, No. 19-1268, 2019 WL 6998150, at *1 (3d Cir. Dec. 20, 2019). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotation marks omitted). The quantum of proof is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial if the ALJ ignores countervailing evidence or fails to resolve a conflict created by such evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966).

The question before the Court, therefore, is not whether Welker is disabled, but whether the Commissioner's determination that Welker is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence."); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The [Commissioner]'s determination as to the status of a claim requires the correct application of the law to the facts."); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F. Supp. 2d 623, 627 (M.D. Pa. 2003). If "the ALJ's findings of fact . . . are supported by substantial evidence in the record," the Court is bound by those findings. *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).

### III.   THE ALJ'S DECISION

In his written decision, the ALJ determined that "[Welker] has not been under a disability, as defined in the Social Security Act, from May 20, 2014, the amended alleged onset date, through the date of this decision." (Doc. 8-2, at 27). The ALJ reached this conclusion after proceeding through the five-step sequential analysis provided in 20 C.F.R. § 404.1520(a)(4).

### A.   STEP ONE

At step one of the five-step analysis, the ALJ must determine whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If a claimant is engaging in substantial gainful activity, the claimant is not disabled, regardless of age, education, or

work experience. 20 C.F.R. § 404.1520(b). Substantial gainful activity is defined as work activity requiring significant physical or mental activity and resulting in pay or profit. 20 C.F.R. § 404.1572(a)–(b). The ALJ must consider only the earnings of the claimant. 20 C.F.R. § 404.1574(a)(2). Here, the ALJ determined that "[Welker] has not engaged in substantial gainful activity since May 20, 2014, the amended alleged onset date. (Doc. 8-2, at 18).

B. STEP TWO

At step two, the ALJ must determine whether the claimant has a medically determinable impairment—or a combination of impairments—that is severe and meets the 12-month duration requirement. 20 C.F.R. § 404.1520(a)(4)(ii). If the ALJ determines that a claimant does not have an "impairment or combination of impairments which significantly limits" the claimant's "physical or mental ability to do basic work activities," the ALJ will find that the claimant does not have a severe impairment and is therefore not disabled. 20 C.F.R. § 404.1520(c). If a claimant establishes a severe impairment or combination of impairments, the ALJ considers step three. Here, the ALJ found that Welker had 10 medically determinable impairments—schizophrenia, paranoid type; bipolar disorder, depressed severe with psychotic features; substance-induced psychotic disorder with delusions; brief psychotic disorder; attention deficit hyperactivity disorder (ADHD) combined type; panic disorder without agoraphobia; generalized anxiety disorder (GAD); post-traumatic stress disorder (PTSD); cannabis use disorder; and alcohol use disorder. (Doc. 8-2, at 19).

C. STEP THREE

At step three, the ALJ must determine whether the severe impairment or combination of impairments meets or equals the medical equivalent of an impairment listed in the version of 20 C.F.R. Part 404, Subpt. P, App. 1 that was in effect on the date of the ALJ's decision.

20 C.F.R. § 404.1520(a)(4)(iii). The sections in this appendix are commonly referred to as "listings." Here, the ALJ determined that neither of Welker's impairments, considered individually or collectively, met or medically equaled the severity of a listed impairment. (Doc. 8-2, at 19).

### D. Residual Functional Capacity

Between steps three and four, the ALJ evaluates the claimant's residual functional capacity (RFC), crafted upon consideration of all the evidence presented. At this intermediate step, the ALJ considers all claimant's symptoms and "the extent to which [they] can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a). Here, Welker alleged that his medical impairments affected his ability to retain information, complete tasks, concentrate, understand, follow instructions, and get along with others. (Doc. 8-6, at 45). The ALJ found that while Welker's medically determinable impairments could reasonably be expected to cause the alleged symptoms, Welker's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Doc. 8-2, at 23). Next, the ALJ went on to explain the record evidence in detail.

After weighing and considering the evidence, the ALJ determined that Welker had the, [RFC] to perform a full range of work at all exertional levels, but with the following nonexertional limitations:

> [Welker] is limited to simple, routine tasks, not performed in a fast-paced production environment, involving only simple work-related decisions, and in general, relatively few work place changes with a Specific Vocational Preparation (SVP) of 1 or 2. In addition, [Welker] must work primarily with objects rather than people with no jobs requiring teamwork or interaction with the public. [Welker] is also limited to occupations that do not involve the sale or preparation of alcoholic beverages or marijuana. Finally, [Welker] is limited

to occupations that do not involve access to narcotic drugs and occupations that are not in the medical field.

(Doc. 8-2, at 22).

E. STEP FOUR

Step four requires the ALJ to determine whether the claimant has the RFC to perform the requirements of their past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). A finding that the claimant can still perform past relevant work requires a determination that the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(iv). Past relevant work is defined as work that the claimant has done within the past 15 years, that was substantial gainful activity, and that lasted long enough for the claimant to learn how to do it. 20 C.F.R. § 404.1560(b). "If the claimant can perform his past relevant work despite his limitations, he is not disabled." *Hess,* 931 F.3d at 202 (citing 20 C.F.R. § 404.1520(a)(4)(iv)). Here, based upon testimony adduced from a vocational expert at Welker's administrative hearing, the ALJ determined that Welker was unable to perform any past relevant work. (Doc. 8-2, at 26).

F. STEP FIVE

At step five of the sequential analysis, the ALJ considers the claimant's age, education, and work experience to determine whether the claimant can make the adjustment to other work. 20 C.F.R. § 404.1520(a)(4)(v). If a claimant can adjust to other work, they will not be considered disabled. 20 C.F.R. § 404.1520(a)(4)(v). Here, considering Welker's age, education, work experience, and RFC, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Welker could have performed. (Doc. 8-2, at 27). In making this determination, the ALJ relied on the expertise of the vocational expert, who testified that Welker could have performed the requirements of occupations, such as a lumber stacker, an agriculture laborer, and an equipment cleaner (occupations with open

positions ranging from 90,000 to 130,000 nationally). (Doc. 8-2, at 27). Accordingly, the ALJ determined that Welker was not disabled and denied his application for benefits. (Doc. 8-2, at 27).

## IV. DISCUSSION

Welker advances three arguments on appeal. (Doc. 13, at 9). Specifically, Welker argues that the ALJ erred by (1) affording significant weight to the treatment notes of his treating psychiatrist, Dr. Muhammad Qamar, (2) assessing his credibility and the credibility of his long-time girlfriend, Jennifer Lowman, and (3) crafting the RFC assessment. (Doc. 13, at 9). In response, the Commissioner maintains that the ALJ's decision is supported by substantial evidence and is in accordance with the law and regulations. (Doc. 7; Doc. 16).

### A. THE ALJ DID NOT ERR IN HIS CONSIDERATION OF DR. MUHAMMAD QAMAR'S TREATMENT NOTES

Welker's first claim of error, challenges the ALJ's consideration of the treatment notes by his treating psychiatrist – Dr. Muhammad Qamar. (Doc. 13, at 16). The Court of Appeals has ruled that the ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations. *Chandler v. Commissioner of Social Security*, 667 F.3d 356, 361 (3d Cir. 2011). When determining an individual's RFC, the ALJ must consider all the evidence of record, regardless of its source, including a claimant's medical signs and laboratory findings, daily activities, medical source statements, and a claimant's medical history. SSR 96-8p, 1996 WL 374184, at *5; *see also Mullin v. Apfel*, 79 F. Supp. 2d 544, 548 (E.D. Pa. 2000). Inevitably, this includes evidence from a claimant's treating sources. 20 C.F.R. § 404.1527(a)(2). "A cardinal principal guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially

when their opinions reflect expert judgement based on a continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (internal quotations omitted). However, a "treating source's opinion is not entitled to controlling weight if it is 'inconsistent with the other substantial evidence in [the] case record. *Scouten v. Comm'r Soc. Sec.*, 722 F. App'x 288, 290 (3d Cir. 2018) (alteration in original (quoting 20 C.F.R. § 404.1527(c)(2)).

Guided by these legal tenets, the Court finds substantial evidence to support the ALJ's consideration of Dr. Qamar's opinion. In the instant case, the ALJ determined that Welker suffered from the following severe impairments: schizophrenia, paranoid type; bipolar disorder, depressed severe with psychotic features; substance-induced psychotic disorder with delusions; brief psychotic disorder; attention deficit hyperactivity disorder (ADHD) combined type; panic disorder without agoraphobia; generalized anxiety disorder (GAD); post-traumatic stress disorder (PTSD); cannabis use disorder; and alcohol use disorder. (Doc. 13, at 10). Welker, argues that since there are no medical source statements from a treating source regarding the severity of these impairments in the record, the ALJ predominately relied upon Dr. Qamar's treatment records to assess the severity of his impairments. (Doc. 13, at 10). Welker also asserts that Dr. Qamar's records are wholly unreliable and that the ALJ committed error in relying on them. (Doc. 13, at 10). For example, Welker contends that portions of Dr. Qamar's treatment notes are duplicates, which raise questions concerning their validity. (Doc. 13, at 10). Moreover, Welker avers that a number of Dr. Qamar's treatment notes are fabricated and reveal physical examinations on dates in which Welker was not available. (Doc. 13, at 12-13). Welker further contends that most of Dr. Qamar's treatment records are internally inconsistent, incomprehensible, or incomplete, including

descriptions of Welker's planned medications, medical impairments, and mental health hospitalizations. (Doc. 13, at 10-16).

The Court is not persuaded by Welker's argument as to this issue. In this case, Welker reported and testified to suffering from severe anxiety, which causes panic attacks in work situations, memory and concentration problems, mood swings, paranoia, and irrational thinking. (Doc. 8-6, at 40). Welker further testified that his ability to complete tasks, finish what he starts, understand, follow instructions, get along with others, and handle stress or changes in routine is adversely affected by his symptomatology and that he fears social situations. (Doc. 8-6, at 45; Doc. 8-2, at 37-77). In January 2016, Welker visited his treating psychiatrist, Dr. Qamar. (Doc. 8-13, at 2-8). Dr. Qamar's treatment notes reveal that Welker reported that his mental health medications were very helpful, Welker denied being depressed, hopeless, or helpless, and reported that he was eating and sleeping well. (Doc. 8-13, at 5). Dr. Qamar further noted that Welker denied experiencing auditory and visual hallucinations, paranoia, anger, irritability, manic symptoms, and suicidal and homicidal ideations. (Doc. 8-13, at 6). Additionally, it was noted that Welker was calm, cooperative, alert, and oriented to person, place and time, and situation with intact short and long-term memory and an appropriate affect. (Doc. 8-13, at 6).

Similarly, in October 2017, Welker visited Dr. Qamar and upon examination, Dr. Qamar noted that Welker's sleep was stable; that his appetite was good; that the prescription drugs, Klonopin and Latuda were good for his anxiety and helped stabilize his mood; and that he was able to stay on task and do his artwork to completion with the prescription medication Adderall. (Doc. 8-14, at 851). In March 2018, upon examination, Dr. Qamar noted that Welker was stable; his sleep patterns had improved; he was no longer distractible,

and his attention span had improved; his mood irritability was no longer present; he denied any problems with associated anger; and he described no depressive symptoms and associated anger. (Doc. 8-14, at 50-51). In February 2018, upon examination, Dr. Qamar reported that Welker displayed no serious mental status abnormalities and a mental status evaluation revealed logical thinking with no signs of cognitive difficulties. (Doc. 8-12, at 10-11). In June 2018, Welker visited Dr. Qamar and similar to his previous visits, Dr. Qamar reported that Welker's orientation, memory, and cognitive abilities were normal and intact, and that he displayed no signs of hyperactive or attentional difficulties. (Doc. 8-14, at 64-65). Dr. Qamar also noted that Welker denied experiencing medication side effects and reported that the prescription medication, Latuda was very effective and played an integral role in Welker denying any psychiatric symptoms or problems. (Doc. 8-14, at 64-65).

Similar to Dr. Qamar's findings, other physicians of record reported limited abnormal mental status findings. For example, upon physical examination in April 2014, Dr. Michael Pitzer revealed that Welker presented with a pleasant mood and appropriate effect. (Doc. 8-8, at 58). Additionally, during a mental status examination in December 2014, Dr. Nitin Sheth revealed that Welker was fully oriented with intact age appropriate cognitive functioning, logical thinking, intact language skills and intact short and long-term memory. (Doc. 8-11, at 32-36). Dr. Sheth further reported that Welker displayed fair social judgement and appropriate thought processes and that he denied suicidal and homicidal ideations. (Doc. 8-11, at 32-36).

Welker argues that the ALJ erred in affording significant weight to the treatment notes of his treating psychiatrist. (Doc. 13, at 10-16). Welker further contends that Dr. Qamar's treatment notes are unreliable and fabricated. (Doc. 13, at 10-16). Therefore, the ALJ's

reliance on Dr. Qamar's treatment notes are not supported by substantial evidence. (Doc. 13, at 10-16). However, the law is clear that, when determining an individual's RFC, the ALJ must consider all the evidence of record, regardless of its source, including evidence from a claimant's treating sources. SSR 96-8p, 1996 WL 374184, at *5; *see also* Mullin, 79 F. Supp. 2d at 548; 20 C.F.R. § 404.1527(a)(2). Additionally, as mentioned *supra*, treating sources have the closest ties to a claimant, and therefore their opinions are generally entitled to more weight. *See* 20 C.F.R. §404.1527(c)(2)("Generally, we give more weight to opinions from your treating sources . . . "); 20 C.F.R. §404.1502 (defining treating source). Notwithstanding these legal tenets, the law also provides that a "treating source's opinion is not entitled to controlling weight if it is 'inconsistent with the other substantial evidence in [the] case record. *Scouten v. Comm'r Soc. Sec.*, 722 F. App'x 288, 290 (3d Cir. 2018) (alteration in original (quoting 20 C.F.R. § 404.1527(c)(2)). In the present case, however, Dr. Qamar's mental status examinations were consistent with other substantial evidence in the case record. For example, Dr. Pitzer and Dr. Sheth both reported similar mental status findings, including that Welker presented with a pleasant mood and appropriate effect; he was fully oriented with intact age appropriate cognitive functioning and logical thinking; he displayed fair social judgement and appropriate thought processes; and he denied suicidal and homicidal ideations. (Doc. 8-8, at 58; Doc. 8-11, at 32-36). Therefore, because the Court finds that the ALJ's assessment of the evidence in this case complied with the requirements of the law, the Court finds that the ALJ did not err in affording significant weight to the treatment notes of Welker's treating psychiatrist, Dr. Qamar.

> B. SUBSTANTIAL EVIDENCE SUPPORTS THE ALJ'S CREDIBILITY FINDINGS FOR WELKER AND HIS LONG-TIME GIRLFRIEND, JENNIFER LOWMAN

Next, Welker argues that the ALJ erred in assessing his credibility and the credibility of his long-time girlfriend, Jennifer Lowman. (Doc. 13, at 16-19). In evaluating a claimant's subjective complaints, the ALJ must employ a two-step inquiry where he must (1) determine whether an underlying medically determinable mental impairment or impairments could reasonably be expected to produce the claimant's symptoms and, if so, (2) evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functional limitations. *See* 20 C.F.R. § 404.1529(b)-(c). "A claimant's testimony regarding his or her subjective pain is entitled to great weight, particularly when supported by competent medical evidence." *Hirschfeld v. Apfel*, 159 F. Supp.2d 802, 811 (E.D. Pa. 2001)(quoting *Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3d Cir. 1979). As correctly asserted by Welker, the ALJ has discretion to make determinations on the credibility of witnesses and reject a claimant's claim of disabling pain if he affirmatively addresses the claim in his decision, specifies the reasons for rejecting it, and has support for his conclusion in the record. *Hirschfeld v. Apfel*, 159 F. Supp.2d at 811. Additionally, a claimant's subjective allegations of symptoms alone will not establish that he has functional limitations or is disabled. 20 C.F.R.§ 404.1529(a).

Applying the above standard, the Court finds that the ALJ committed no error in assessing Welker's symptom allegations and the credibility of his long-time girlfriend, Jennifer Lowman. In the instant case, Welker testified that he could not work because he "[does not] like people" and that he "get[s] really sick" to the point that he cannot function. (Doc. 8-2, at 51-52). Additionally, Welker's long-time girlfriend, Jennifer Lowman, described Welker's

behavior as cycling between depression and mania with times of paranoia. (Doc. 8-2, at 73). Moreover, Ms. Lowman reported that when depressed, Welker experiences difficulty getting out of bed, taking care of his daily activities, and has suicidal tendencies. (Doc. 8-2, at 73). Ms. Lowman further reported that Welker experiences challenges with his neighbors and the delusion that they are out to get him. (Doc. 8-2, at 74). Welker argues that the ALJ erroneously relied upon the treatment notes of Dr. Qamar, Dr. Pitzer, and Dr. Sheth to discredit his statements and the statements of his girlfriend, Ms. Lowman. (Doc. 13, at 17). Welker further contends that the ALJ's reliance on these records is misleading and does not provide sufficient support for his credibility findings. (Doc. 13, at 17-18).

      The Court finds Welker's argument on this score unavailing. In finding Welker and Ms. Lowman's testimony and reports concerning the disabling effects of Welker's impairments "not entirely consistent with the medical evidence and other evidence in the record," the ALJ considered Welker and Ms. Lowman's testimony and statements concerning Welker's limitations. The ALJ, however, concluded that other evidence, including record evidence, which demonstrated limited abnormal mental status findings. For example, upon physical examination with his treating psychiatrist – Dr. Qamar, in January 2016, October 2017, February 2018, March 2018, and June 2018 – Welker reported that his sleep was stable; that his appetite was good; and that his mental health prescription medications (including Klonopin, Latuda, and Adderall) improved his anxiety, stabilized his mood, and that he was able to stay on task and do his artwork to completion. (Doc. 8-14, at 851). Further, upon physical examinations, Dr. Qamar noted that Welker denied experiencing auditory and visual hallucinations, paranoia, anger, irritability, manic symptoms, and suicidal and homicidal ideations. (Doc. 8-13, at 6). Additionally, Dr. Qamar

noted that Welker was stable; that he was no longer distractible, and his attention span had improved; his mood irritability was no longer present; he denied any problems with associated anger; and he described no depressive symptoms and associated anger. (Doc. 8-14, at 50-51). Dr. Qamar also reported that Welker displayed no serious mental status abnormalities and a mental status evaluation revealed that Welker could perform logical thinking with no signs of cognitive difficulties. (Doc. 8-12, at 10-11).

Similar to Dr. Qamar's findings, Dr. Pitzer and Dr. Sheth also reported limited abnormal mental status findings. For example, in April 2014, Dr. Pitzer reported that Welker presented with a pleasant mood and appropriate effect. (Doc. 8-8, at 58). Additionally, during a mental status examination in December 2014, Dr. Sheth reported that Welker was fully oriented with intact age appropriate cognitive functioning, logical thinking, intact language skills and intact short and long-term memory. (Doc. 8-11, at 32-36). Dr. Sheth further reported that Welker demonstrated fair social judgement and appropriate thought processes; that he denied suicidal ideas, intentions, and plans, and also denied homicidal ideas and intentions. (Doc. 8-11, at 32-36).

Moreover, the ALJ considered and weighed other evidence inconsistent with Welker's symptom allegations, including the medical opinion of State agency psychological consultant, Dr. Erin Urbanowicz who opined that Welker retained the ability to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairments. (Doc. 8-3, at 11-13). Welker argues that the ALJ erroneously relied upon the treatment notes of Dr. Qamar, Dr. Pitzer, and Dr. Sheth to discredit his statements and the statements of his girlfriend, Ms. Lowman. (Doc. 13, at 17). However, as previously stated, the ALJ must consider all the evidence of record, regardless of its source, including a

claimant's medical signs and laboratory findings, daily activities, medical source statements, and a claimant's medical history. SSR 96-8p, 1996 WL 374184, at *5; *see also Mullin v. Apfel*, 79 F. Supp. 2d 544, 548 (E.D. Pa. 2000). In the present case, the ALJ considered the treatment notes of Dr. Qamar, Dr. Pitzer, and Dr. Sheth against the entire medical record and relied on them in affording limited weight to Welker and Ms. Lowman's credibility. It is the right and responsibility of the ALJ to make such assessments, and the Court finds that substantial evidence supported his determination.

Accordingly, the Court finds that the ALJ fulfilled his duty in considering the credibility of the statements provided by Welker and Ms. Lowman and weighed them against the entire medical record. In doing so, the ALJ provided a thorough explanation in affording limited weight to their credibility. Therefore, the Court finds that the ALJ did not err in assessing the credibility of Welker and his long-time girlfriend, Ms. Lowman.

      C.    S<small>UBSTANTIAL</small> E<small>VIDENCE</small> S<small>UPPORTS THE</small> ALJ'<small>S</small> RFC D<small>ETERMINATION</small>

Welker's last contention, challenges the ALJ's RFC assessment. Assessing a claimant's RFC falls within the purview of the ALJ. 20 C.F.R. § 404.1546(c); SSR 96-8p, 1996 WL 374184 (S.S.A. July 2, 1996). "[RFC] is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 (3d Cir. 1999)). Specifically, one's RFC reflects the *most* that an individual can still do, despite his or her limitations, and is used at steps four and five to evaluate the claimant's case. 20 C.F.R. §§ 404.1520, 404.1545; SSR 96-8P, 1996 WL 374184 at *2. In crafting the RFC, the ALJ must consider all the evidence of record, including medical signs and laboratory findings, daily activities, medical source statements, and a claimant's medical history. SSR 96-8p, 1996 WL

374184, at *5; *see also Mullin*, 79 F. Supp. 2d at 548 (E.D. Pa. 2000). An ALJ's RFC findings, however, must be supported by the medical evidence. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986). "[O]nce the ALJ has made this [RFC] determination, [a court's] review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence." *Black v. Berryhill*, No. 16-1768, 2018 WL 4189661 at *3 (M.D. Pa. Apr. 13, 2018).

Applying the above standard to the present record, the Court finds substantial evidence to support the ALJ's RFC determination. Welker argues that the ALJ's RFC assessment is not supported by substantial evidence. (Doc. 13, at 20). Specifically, Welker asserts that the ALJ failed to consider all of the relevant evidence, including his multiple psychiatric hospitalizations; his work history, which consists of a number of jobs that he held for short periods of time ranging from one day to nine months; his subjective complaints; and Dr. Adam Bloom's medical opinion that his disability level was severe. (Doc. 13, at 20-21). Welker further argues that the ALJ dismissed the August 2018 therapeutic note of Licensed Professional Counselor (LPC) Christine Bush, which was inconsistent with Dr. Qamar's treatment notes. (Doc. 8-14, at 67-68).

The Court disagrees. In crafting the RFC, the ALJ considered all of Welker's mental impairments, including his schizophrenia, paranoid type; bipolar disorder, depressed severe with psychotic features; substance-induced psychotic disorder with delusions; brief psychotic disorder; attention deficit hyperactivity disorder (ADHD) combined type; panic disorder without agoraphobia; generalized anxiety disorder (GAD); post-traumatic stress disorder (PTSD); cannabis use disorder; and alcohol use disorder. (Doc. 8-2, at 19). The ALJ explained, however, that despite evidence of severe impairments, the objective medical

evidence revealed limited abnormal mental status findings. (Doc. 8-2, at 22-26). For example, in January 2016, October 2017, February 2018, March 2018, and June 2018, Welker's treating psychiatrist, Dr. Qamar, reported that Welker's sleep was stable; that his appetite was good; and that his mental health prescription medications (including Klonopin, Latuda, and Adderall) improved his anxiety, stabilized his mood, and that he was able to stay on task and do his artwork to completion. (Doc. 8-14, at 851). Further, Dr. Qamar's treatment notes revealed that Welker denied experiencing auditory and visual hallucinations, paranoia, anger, irritability, manic symptoms, suicidal ideations, and homicidal ideations. (Doc. 8-13, at 6). Additionally, Dr. Qamar's treatment notes demonstrated that Welker's irritable mood was no longer present; that he denied any problems with associated anger; that he described no depressive symptoms and associated anger; that he displayed no serious mental status abnormalities; and that a mental status evaluation revealed that Welker conducted logical thinking with no signs of cognitive difficulties. (Doc. 8-14, at 50-51; Doc. 8-12, at 10-11).

Similar to Dr. Qamar's findings, the ALJ explained that Dr. Pitzer and Dr. Sheth also reported limited abnormal mental status findings. For example, in April 2014, Dr. Pitzer reported that Welker presented with a pleasant mood and appropriate effect. (Doc. 8-8, at 58). Additionally, in December 2014, Welker was examined by Dr. Sheth who reported that he was fully oriented with intact age appropriate cognitive functioning, logical thinking, intact language skills and intact short and long-term memory. (Doc. 8-11, at 32-36). Dr. Sheth also reported that Welker demonstrated fair social judgement, appropriate thought processes, and that he denied suicidal and homicidal ideations. (Doc. 8-11, at 32-36).

The ALJ considered the opinion evidence of record, including the opinions of State agency psychological consultant, Dr. Urbanowicz, and Dr. Bloom. (Doc. 8-2, at 25-26). As

mentioned *supra*, Dr. Urbanowicz opined that Welker retained the ability to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairments. (Doc. 8-3, at 11-13). The ALJ afforded Dr. Urbanowicz's opinion significant weight, concluding that although Dr. Urbanowicz did not treat or examine Welker, she was familiar with the definitions and evidentiary standards used by the Social Security Administration and her opinion was consistent with the objective findings of Dr. Sheth and Dr. Qamar. (Doc. 8-2, at 26). Thus, the ALJ afforded significant weight to Dr. Urbanowicz's opinion.

Additionally, the ALJ considered the opinion of Dr. Bloom, who in February 2018, reported that Welker's disability level was severe. (Doc. 8-11, at 106-110). The ALJ, however, afforded Dr. Bloom's opinion "little" weight concluding that Dr. Bloom expressed his opinion at the time of Welker's discharge from the hospital. (Doc. 8-2, at 25). Additionally, the ALJ explained that Dr. Bloom failed to complete a function-by-function analysis of Welker's ability to perform basic work-related activities and that his opinion was inconsistent with the objective findings, specifically Dr. Qamar's opinion. (Doc. 8-2, at 25). Thus, the ALJ afforded "little" weight to Dr. Bloom's opinion.

Lastly, the ALJ considered other evidence in crafting the RFC, including Welker's own statements. For example, Welker testified and reported that he experiences mood swings, paranoia, irrational thinking, impulsivity, memory problems, concentration problems, depression, and severe anxiety. (Doc. 8-6, at 40; Doc. 8-2, at 52-56). Welker further reported that his medical impairments affect his ability to retain information, complete tasks, concentrate, understand, follow instructions, and get along with others. (Doc. 8-6, at 45). Despite alleging disabling symptoms stemming from his mental health impairments, Welker

and Ms. Lowman testified and reported that Welker drives, shops in stores and by computer, performs light household chores, reads, spends hours on his smart phone and computer watching multimedia entertainment, listens to music, is capable of caring for most of his personal needs, prepares light meals, enjoys playing computer games, and is able to manage his finances. (Doc. 8-2, at 37-77; Doc. 8-6, at 40-47).

To reiterate, this Court is not now tasked with revisiting these factual issues, and we may not substitute our judgment for that of the ALJ. Instead, we are limited to determining whether the ALJ provided valid reasons for his evaluations and based his conclusions on substantial evidence. Thus, finding that the ALJ provided adequate articulation for his RFC determination, which is grounded in substantial evidence, the Court finds no basis for disturbing the ALJ's RFC determination.

### V.  CONCLUSION

Based on the foregoing, the Court **AFFIRMS** the Commissioner's decision to deny Welker disability benefits, directs that **FINAL JUDGMENT BE ENTERED** in favor of the Commissioner and against Welker, and directs the Clerk of Court to **CLOSE** this case.

An appropriate Order follows.

Dated: February 25, 2021

*s/ Karoline Mehalchick*
**KAROLINE MEHALCHICK**
**United States Magistrate Judge**